IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 6, 2012

## STATE OF TENNESSEE v. JAMES RICHARDSON REECE

**Appeal from the Criminal Court for Sumner County**
**No. 208-2010     Tom E. Gray, Presiding Judge**

**No. M2011-01556-CCA-R3-CD - Filed March 14, 2013**

James Richardson Reece, the defendant, was arrested for an aggravated assault which occurred in a workshop underneath his apartment. Immediately after his arrest, the defendant began to challenge the actions of the Sumner County court system, filing numerous documents with this Court and the Tennessee Supreme Court and suing various persons and entities in federal court. The lower courts appointed four separate attorneys to represent the defendant, but each moved to withdraw. At the defendant's urging, the trial court allowed the defendant to waive his right to counsel. When the defendant subsequently requested counsel on the eve of trial, the trial court refused to appoint an attorney. A jury convicted the defendant of aggravated assault, a Class C felony. On appeal, the defendant asserts he was denied the right to counsel and challenges the sufficiency of the convicting evidence. Although the evidence supported the conviction, we conclude that the defendant did not waive or forfeit his right to counsel and reverse and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JERRY L. SMITH and ALAN E. GLENN, J.J., joined.

Manuel B. Russ, Nashville, Tennessee, on appeal, for the appellant, James Richardson Reece.

Robert E. Cooper, Attorney General and Reporter; Meredith DeVault, Senior Counsel; L. Ray Whitley, District Attorney General; and Tara Wyllie, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural History

The defendant was arrested for aggravated assault on September 19, 2009. On September 24, 2009, the defendant filed a Motion for Appointment of Counsel in general sessions court, attaching an affidavit of indigence. The general sessions court did not rule on the defendant's motion and informed the defendant that he would be appointed counsel on the date of his hearing, set for November 4, 2009. The defendant applied for a writ of mandamus to the Circuit Court for Sumner County, requesting the court to require the general sessions court to rule on his motion. Judge Dee David Gay of the Criminal Court for Sumner County issued an order denying the writ, noting that the defendant would be appointed counsel who would represent him on the day of the hearing. The defendant then filed an action in federal court against Sumner County, General Sessions Judge James Hunter, Judge C.L. Rogers of the 18th judicial district's Circuit Court, and Judge Dee David Gay of the 18th judicial district's Criminal Court.

On November 4, 2009, the date of his hearing, the defendant filed a motion for recusal for the general sessions judge whom he had sued in his federal action. The Tennessee Supreme Court, on November 6, 2009, entered an order designating John T. Gwin of the Wilson County General Sessions Court to hear the case. On December 7, 2009, the defendant moved to disqualify the Sumner County District Attorney and requested a change of venue based on his federal action. Judge Gwin appointed Roger Sindle to serve as attorney for the defendant on December 7, 2009. Three days later,[1] the defendant moved the court to allow his counsel to withdraw, citing a "lack of conventionally shared standards for communication," which apparently stemmed from counsel, who practiced from his home, denying the defendant permission to bring paperwork to his house and insisting on meeting at a public place, where counsel allegedly then labeled the defendant "uncooperative." Counsel shortly filed a motion to withdraw, stating that the defendant refused to cooperate and "attempted to intimidate his Counsel by loud, argumentative tones and by belligerent looks." The defendant moved the court to sanction his counsel. The general sessions court granted counsel's motion to withdraw and appointed Nathan Whittle as his new attorney on January 5, 2010. Mr. Whittle moved to withdraw on February 5, 2010, basing his motion on the fact that the attorney-client relationship had broken down to the point that he was unable to continue representation, "professional considerations," and the defendant's lack of confidence in the representation. On February 8, 2010, the general sessions court held a preliminary hearing and in a written order granted Mr. Whittle's motion to withdraw, ordered the defendant to proceed pro se, and denied the motion to disqualify the district attorney general. On February 17, 2010, the general sessions court denied the motion for change of

---

[1]This filing is file-stamped on the 10th of December, but the defendant alludes to a December 11th meeting.

venue and the motion to sanction counsel.

The defendant was indicted on March 4, 2010. A few days thereafter, the defendant appealed the judgments from the preliminary hearing to the this Court, which denied the appeal on June 9, 2010.

On May 3, 2010, Chancellor Tom E. Gray,[2] appointed Laura Frost as counsel for the defendant.[3] On May 27, 2010, the defendant, not acting through his counsel, filed a Motion for Clarification regarding the rulings of the general sessions court rendered on February 8, 2010. Apparently, the defendant filed this motion both in general sessions and in criminal court, and the criminal court denied the motion. On June 1, 2010, Ms. Frost moved to withdraw, basing her motion on the defendant's insistence on pursuing objectives and taking actions his counsel considered "collateral and imprudent."

The defendant responded to Ms. Frost's motion in a filing entitled "Defendant's Compulsory Response to Specific Allegations Contained Within Motion to Withdraw." The defendant objected to counsel's motion to withdraw, speculated that counsel wanted to withdraw because she was concerned the "judicially unpopular" case would have an adverse effect on her career, and alleged his case would be materially adversely affected by counsel's withdrawal. The defendant stated that he would "engage the opposition" either through Ms. Frost or "reluctantly pro se." He asked the court to deny the motion to withdraw "under any of Counsel's stated reasons" and in the alternative asked for "no further appointment of counsel at this time."

At the June 11, 2010 hearing on the motion to withdraw, counsel represented that she and the defendant had "reached an impasse." The defendant testified he had repeatedly asked counsel to file certain documents, which she had refused to do, and requested the court to make determinations regarding Ms. Frost's motion, which alleged the defendant insisted on pursuing imprudent actions. The trial court stated it would not make findings on the allegations, but found the defendant's alternative prayer for no further appointment of counsel "a good request." The defendant objected to the granting of counsel's motion. The trial court allowed Ms. Frost to withdraw, finding in a written order that she had properly moved to withdraw when the defendant insisted she take actions which she thought would be damaging. Ms. Frost gave the defendant copies of discovery materials she had received.

---

[2]The judge previously assigned to the case recused himself because he was a defendant in the federal lawsuit.

[3]A second order appointing Ms. Frost was entered on May 5, 2010.

The defendant filed a second appeal to this court, appealing various actions of the general sessions and circuit court since his arrest and requesting a change of venue. He also requested a rehearing of his prior application. The petition to rehear was denied on July 13, 2010. A second motion to rehear was filed on August 2, 2010. The defendant applied for permission to appeal to the Tennessee Supreme Court, which on December 8, 2010 denied his application.

On July 2, 2010, the trial court held a hearing during which the prosecution made a plea offer to the defendant, noting that it had previously communicated the offer to Ms. Frost. After the defendant, who was proceeding pro se at the hearing, rejected the offer, the trial court sought to make a determination of indigence. The trial court told the defendant it was attempting to determine whether he should have counsel or whether it should appoint elbow counsel to assist him. The defendant at first refused to answer the trial court's questions, and the trial court informed him that the answers were not potentially incriminating and therefore not protected under the Fifth Amendment and told him it would revoke his bond if he did not answer. The defendant told the court he had attempted to hire counsel but was unable to do so because no lawyer would take his case. The trial court asked the defendant if he wanted an attorney and noted that it would not consider any pro se filings from the defendant if he was represented by an attorney. The trial court stated, "Based on your statements, the Court is going to appoint you elbow attorney if you're going to represent yourself, but I want to – you have some choice in the matter." The trial court reiterated it would appoint elbow counsel to help the defendant on the day of trial if he did not want representation, but did not explain the term to the defendant. The defendant, who stated he had a ninth grade education, responded that "[o]n a human element-type level, no way in the world would I ever want to represent myself." The defendant nevertheless concluded, after a lengthy exploration of the procedural history of the case,

> If any reasonable person standing in my shoes would have undergone the same history that I have, both with attorneys appointed by the County of Sumner and the judiciary which is elected by the County of Sumner, in responding to the present question now, Mr. Reece, do you desire another attorney appointed to you from Sumner County and do you desire any further contact with the judiciary of Sumner County – if that might be question two – the answer to both questions summarily is no.

The defendant then referred to a request for appointment of counsel that he had pending before the Court of Criminal Appeals. The trial court stated that based on his request for counsel to the Court of Criminal Appeals, it would appoint an attorney to

represent the defendant rather than appointing elbow counsel. The defendant reiterated that he did not want a Sumner County attorney and demanded a separate court to rule on appointment of counsel. The trial court stated it would appoint an attorney and noted the defendant's objection.

The trial court appointed Rob McKinney to represent the defendant on July 2, 2010. On August 16, 2010, Mr. McKinney moved to withdraw, attaching a letter from the defendant which stated that the defendant had not asked for assistance of counsel. The defendant wrote that he had not been able to pursue his case because he was represented by Mr. McKinney. He told his counsel, "Should you choose to dive into knee-deep water at the behest of this smugly immune court, the decisions you make, the actions you take, and the liabilities you choose to assume, are all at your peril." He denied Mr. McKinney was his attorney and stated he would initiate a separate proceeding for damages if Mr. McKinney continued to represent him. The trial court denied the motion to withdraw on August 25, 2010. Counsel again moved to withdraw on September 3, 2010. In his motion, counsel included a Memorandum of Law in which he recited that the defendant "understands the consequences of declining representation, including the decision of the appointing court that appointment of successor counsel i[s] unjustified, that Defendant may be required to proceed pro se, and that Defendant will be required to follow all rules of trial procedure."

During the October 13 hearing, counsel for the defendant stated that the defendant had by email and in a meeting told counsel he wished to represent himself. Counsel concluded that "[h]e does not acknowledge me as his attorney" and that the defendant "wishes to proceed pro se."

At the hearing, the defendant accused the trial court of having unlawfully appointed Mr. McKinney to represent him "deliberately with the intent for encumbering me with an attorney despite my protests." The defendant, who referred to himself as a "hostage," pointed to his right to self-representation under *Faretta v. California*, 422 U.S. 806, 835 (1975). He asserted that he had been "restrained incapable due to your unlawful order for raising a defense because I can't file any motions on my own .... I can't request an audio transcript of the grand jury proceeding from you."[4] The defendant accused the court of having forced him to testify regarding his indigence and having "trumped up a bogus affidavit of indigency and said that I asked for appointed counsel when I deliberately protested that and I said, no, Judge, you're wrong, I'm not asking for counsel."

The trial court stated it had appointed Mr. McKinney, an attorney from Davidson

---

[4]The trial court had entered an order making the audio recordings of the proceedings available only upon written motion.

County, because the defendant had objected during a prior hearing to having an attorney from Sumner County. The court concluded, "I think today is probably the most unequivocal statement of wanting to proceed pro se that has yet been made by this gentleman," and granted the defendant's motion, as well as counsel's motion to withdraw. The trial court did not require the defendant to sign a written waiver of the right to counsel and did not warn the defendant against proceeding pro se. The defendant then lodged certain objections regarding discovery. The court next inquired regarding the State's availability for trial on December 7, 2010, and stated it would set trial for that date pending settlement in another case.

The defendant filed a "Notice and Objection" on November 29, 2010, objecting that the case had been set for trial without a motion and claiming that the case had been set "unlawfully." The defendant also raised certain objections related to discovery. The defendant, on December 3, 2010, requested the Tennessee Supreme Court to stay the proceedings pending its disposition of the defendant's appeal, and the Court denied his request on December 6, 2010.

On the day of trial, the trial court held a hearing on the defendant's Notice and Objection. The defendant demanded a jury trial.[5] He further objected that on October 13, 2010, the only motion before the court had been Mr. McKinney's Motion to Withdraw, and he stated that he had not agreed to set the matter for trial on December 7, 2010 and was not prepared to go forward. The defendant explained that he was unprepared by pointing to certain discovery purportedly withheld by the State. The defendant stated he had not filed subpoenas and had not filed an affirmative defense and attributed his failure to do so to the fact that he had been living out of his truck and that he had not been eating every day. The defendant requested a continuance. The State responded that the defendant had received all the discovery materials and accused the defendant of attempting to delay the matter with his numerous filings and appeals.

The defendant then brought his lack of legal counsel to the trial court's attention. Regarding proceeding pro se, the defendant expressed an intention to use some money he had just received from friends to possibly hire a lawyer and stated:

> I don't know what it'll be, but don't think for a minute that I have ever said I enjoyed or I sought to represent myself. It is only out of the deep mistrust that I believe I have reasonably formed for any attorney associated by appointment with this court or any of the prior courts that has made me – more than

---

[5]It appears that the defendant recorded the October 13 hearing, as he makes reference to the "sealed" audio transcripts and to his own audio recording of the hearing.

ever this last attorney that you appointed unwillingly to me, I
rejected him solely because he was associated with you, Judge,
and it's not like I don't want representation but I can't trust you
anymore.

The defendant stated that his history with the court appointed attorneys was "abysmal,"
apparently as an attempted indictment of his representation rather than an acknowledgment
of any failure to cooperate on his own part. He asserted he had had bad luck but had done
the best "with what I had, the attorneys that were appointed." Regarding Ms. Frost, he
stated:

You know I fought like a banshee to keep her on my case. You
know I wanted her there, Judge, but it was your choice to let her
go just simply based upon her raising her hand and saying, I
want out of this matter.

The defendant stated that Ms. Frost had refused to follow his directives even when he
offered to give her a "waiver" for doing so, and speculated that she had withdrawn to avoid
the ire of the court because he was "not sure she would have been the most popular person
for defending me, at least with the judiciary."

The trial court found that the defendant had received appropriate discovery and that
he had indicated on October 13, 2010, that he desired to proceed pro se. The trial court
found that it had properly set the matter forty-eight days prior to its trial and denied the
continuance. It did, however, grant the defendant's demand for a jury trial.

During voir dire, the defendant told the jury, "I don't know the law and I've been
admonished[6] not to explain why I'm without an attorney or to give you any reasons for that,
so as those things will have to be left unsaid as far as why I'm here pro se. Be it said that it
was my choice, I reckon I'm going to have to struggle with that statement." Prior to the
opening statements, the trial court instructed the jury, "We have a pro se litigant. In other
words, a man who has elected to represent himself, made that conscious decision to represent
himself, and when he is at counsel table or he is standing and makes a statement, only if the
assistant district attorney has agreed and he has agreed is it factual. Whatever he says when
he's representing himself as his attorney is not considered evidence."

The State moved to prohibit the defendant from mentioning his physical

---

[6]There is no record of such an admonishment, but the transcript does contain a bench conference
which was off the record.

circumstances, including that he was living out of his car and not eating enough, and a physical ailment he had.[7] The defendant moved for appointment of counsel, again noting he had just received money from friends which he intended to try to use as a down payment to hire an attorney. He reiterated that he had desired to keep Ms. Frost as his attorney. The defendant explained to the court his perception that his numerous collateral filings were an honorable, if unpopular, fight for the rule of law. The defendant concluded that he would be "tendering a written motion with the Court's indulgence." The court granted the State's motion in part, instructing the defendant not to mention his environmental and financial circumstances because they were not probative. It denied the State's motion with respect to his physical condition, finding that it might have probative value. The defendant again brought up his request for counsel: "I want to file it with the clerk here in open court as far as my request for the appointment of counsel. I'm unable to proceed, Judge." The trial court responded, "We're going forward with the case. We set this case. We gave you the jury trial you asked for this morning because you wouldn't do that."

The State presented the testimony of the victim, Jack Keith Smith. At the time of the assault, the victim had been assisting John Garrott, the owner of the property where the assault had taken place and the defendant's landlord, with odd jobs and had been sleeping in his workshop, which was located immediately under the defendant's apartment. The victim testified that on September 19, 2009 at around 10:00 p.m., he had been at the workshop making a wooden airplane and was getting into his sleeping bag to go to sleep when the defendant came in and began to unplug machines. The victim stated that he told the defendant he had permission to be there, and the defendant said, "not no more, you don't." The victim testified the defendant then grabbed him, put his arm behind his back, and threw him through the wood and glass door. The victim's arm went through the door. The victim testified that the defendant then took him "out back," laid him on a concrete table, lay on top of him, and beat his head against the concrete for approximately thirty minutes. The victim stated that he begged the defendant to let him go, and the defendant finally agreed to let him go if he would leave the property and never come back. The victim promised to do so.

At this point in the testimony, the defendant interrupted to again ask for counsel, asserting that he was unable to proceed. The trial court responded by repeating several times that it was proceeding with the trial, and then denied the oral motion for assistance of counsel.

The State next introduced some photographs of the crime scene, including the concrete table which was covered in blood. The defendant objected to the victim's testimony

_____

[7]The presentencing report states that this condition was a progressive fusion or rheumatoid arthritis of the spine which causes pain, stiffness, and limits mobility.

that it was his blood and again requested counsel. The defendant sought to tender his written motion for an attorney to the bailiff, and the trial court denied the defendant permission to do so during trial.

The victim testified he had to have surgery in which a steel plate was inserted into his jaw and that all his teeth were extracted. He had twenty stitches to the cut on his arm from the glass in the door and bruising to his collar bone. The victim testified his medical bills were in excess of $43,000.

The defendant again requested counsel prior to cross-examination. The trial court denied his request. On cross-examination, the victim testified that he began making the airplane at 10:00 p.m. and the defendant assaulted him at 12:00 a.m. The victim testified that the owner had given him permission to spend the night in the woodshop that evening but he did not specifically ask if he could make an airplane that night. He testified that the defendant did not ask him to leave prior to grabbing him. The defendant impeached the victim by reading from a transcript he had prepared of the preliminary hearing in which the victim stated that he had told the defendant he was not going to leave because he didn't have to. The victim then testified that the defendant had told him to leave.

The victim stated he had had one can of beer and that he told police officers he had only had one can. When the defendant asked him about medical observations of his intoxication, he stated, "Well, if I had four or five, what's it to you?" He could not remember if he told police to give him a gun so he could "take care" of the defendant.

The victim denied that the defendant, at the time he grabbed the victim, told the victim he would get the owner. The victim testified that when the defendant let him go, he knocked on the owner's door and asked him to call an ambulance while the defendant went up to his apartment. He denied touching the defendant. The victim admitted to alcohol use in the past and acknowledged he was on probation as a habitual traffic offender. The victim testified that two months after the assault, he was again in the woodshop at night and the defendant called the police. According to the victim, during this second incident, the owner told the police the victim had permission to be there.

The victim testified that prior to the assault, the defendant had one time come into the shop where the victim and the owner were standing, and had told the victim "we can go to the ground right now." The victim denied having taken $100 from the defendant. The victim acknowledged that his teeth were not "the best in shape" prior to the assault. On redirect, the victim testified that at the time, he had been sleeping in the shop for about one year with the owner's permission. The victim testified he had a scar on his arm from the laceration.

The State's next witness, Officer Walter Booth of the Gallatin Police Department, testified that he was dispatched to the scene and found the victim bleeding from the arm. Officer Booth followed the blood back to the house from which an emergency call had been placed. Officer Booth recalled overhearing the defendant say that he had physical contact with the victim but could not remember the nature of the contact. Officer Booth identified photographs he had taken depicting the defendant with blood spatters on his face and foot and blood soaked into the right sleeve of his shirt and right leg of his pants. He testified that he saw no injury on the defendant and identified pictures taken of the defendant after the blood was removed from his hands and face, showing no injury.

On cross-examination, Officer Booth testified that he found some blood on the ground by the broken window, but acknowledged he could not see it in the photograph. He testified he found no more blood inside but found blood on the sidewalk going from the shop toward the house next door. He testified that the sidewalk led to the area near the bloody concrete table. He did not recall any indication that the blood was leading past the concrete table toward the other house and could not recall whether he had a flashlight when he went to the house or whether the lights were on. Officer Booth testified that he woke the owner up in order to ascertain whether either the defendant or victim had permission to be on the property.

The State called Jessica Wilkinson of the Gallatin Police Department, who testified that she received a call regarding a man lying on the side of the road. At the scene, the victim was lying on the sidewalk. Officer Wilkinson saw the blood by the broken glass in the door and on the concrete slab in the yard. The defendant had removed his bloody clothing and put them in the shower when she came to collect them. She recalled no injuries on the defendant but testified that the victim had a laceration to his arm, a busted lip, damage to his mouth, and bruising on his face and chest. She also testified he had an injury on his head.

On cross-examination, she testified that another officer had videotaped the blood trail. She testified that the video would have been automatically purged if it were not downloaded within sixty or ninety days.

Officer Chris Vines of the Gallatin Police Department testified that he received a call regarding a man who had been in a fight and found the victim sitting in a driveway. The victim had a large laceration on his arm, to which Officer Vines applied sponges, and he was in obvious pain. The victim told him that the defendant had grabbed him with his hands behind his back and thrown him against a glass window. The victim stated that the defendant afterwards placed him on the stone and they lay there for approximately 30 minutes. The victim stated the defendant let him go and he ran away and knocked on the door of an apartment, which the resident opened and then, seeing the victim's condition, closed. He

-10-

then sat in a driveway and the police arrived. Officer Vines charged the defendant, who had told him that the victim was making noise at 12:00 a.m., with aggravated assault. The defendant had no injuries. Officer Vines testified that another officer took video of the crime scene, but that the video was just a duplicate of the photographs.

During Officer Vines' testimony, the defendant again requested counsel. On cross-examination, Officer Vines testified that the victim had told him he had gone to the owner's home and the owner had told him to "put a Band-Aid on it and go back to bed." Officer Vines acknowledged that he did not know of anyone who made contact with the owner to establish that the victim had permission to be on the property. However, he testified that he had always worked nights and was aware that the victim routinely worked late in the shop. Officer Vines testified that his report reflected that the victim was using an air compressor at the time. The defendant asked Officer Vines for numerous legal conclusions after being instructed not to do so by the court, and the court cut off cross-examination. On re-direct, Officer Vines testified that the victim's presence on the property had no bearing on his decision to arrest the defendant and that there were no allegations the victim went upstairs to the defendant's property.

On re-cross-examination, the defendant attempted to question Officer Vines regarding the definition of curtilage but was cut off by the trial court. Officer Vines testified he could not recall being told that the victim had permission to run machinery late at night but testified that he was familiar with the victim, knew he stayed there at night, and had been there on a prior noise complaint. Officer Vines testified that he smelled the odor of alcohol coming from the victim. He stated that he knew the victim used alcohol but the victim was "nowhere near as intoxicated as I've seen him before." He testified that he did not personally speak to the defendant that night but that his report reflected information he received from other officers. He testified that at the time, he did not indicate which parts of his reports were not based on personal knowledge. Officer Vines testified that the victim had told him that the defendant grabbed his arms and they were "tussling" until they both went into the glass pane.

The State introduced the victim's medical records. The records reflect that the victim's blood alcohol level was .138. At the both the Sumner County hospital where the victim was treated and Vanderbilt University Hospital, the victim at some point ranked his pain as a ten out of ten. Medical imaging showed a fracture to his right mandible, a left mandibular condyle fracture, and comminuted nasal fracture. He was given morphine and percocet at the Sumner County hospital where he was treated. He underwent surgery at Vanderbilt, where a steel plate was inserted into his jaw and his jaw was wired shut. He was given morphine, oxycodone, acetaminophen, percocet for pain and discharged with a prescription Lortab and ibuprofen. At Vanderbilt, the victim was grimacing, wincing, groaning, and moaning. The victim also suffered the loss of all his teeth. The medical

records reflect that he had multiple carious teeth. The records also show that, "due to the patient's devastated carious dentition," his teeth were extracted. The victim's records show he had previous missing, loose, and chipped teeth and periodontitits. The medical assessment states, "This patient has a several displaced mandibular fractures with poor dentition. We recommend a full mouth extraction...."

On the second day of the trial, the State requested the trial court provide curative instructions to the jury regarding the defendant's numerous references to his unwillingness to proceed pro se. The defendant, in a detailed history of his legal representation, summed up his sentiments at the time of Ms. Frost's withdrawal as "I do want representation, yet at the same time I trust no one." The court granted the State's motion. The defendant asked the court to clarify whether the court was forbidding him from asking for an attorney and the trial court responded, "I am not. You can ask for it and I will deny it."

The State's next witness was John Garrott, the owner of the property on which the disagreement had taken place. The owner testified he lived approximately seventy-five feet from the building with the wood shop and apartment. The owner had known the victim approximately thirty years and the victim had intermittently helped him with tasks such as cleaning in the workshop for approximately twenty years. The victim had slept in the shop when he needed a place to sleep for the past ten to twenty years and had the owner's permission to stay anytime he needed to stay, including on September 19, 2009. The defendant lived in the apartment above the shop. The owner did not receive a call from the defendant regarding the victim making noise. The owner testified that he was in bed when the victim came to the door with blood on him. The owner sent the victim back to the shop to wash up and see how badly he was hurt and told the victim he would take him to the doctor. The owner had contact with the police later in the night.

On cross-examination, the owner testified that the defendant did not make noise and caused no problems at all in the approximately ten months he stayed. He testified that the defendant was to pay a small amount in rent and fix up the apartment and that he did a good job cleaning it out. The owner "might have" heard some banging and shouting outside his door the night of the assault, but he did not hear well and was not bothered by it. The next day, he washed off the blood on his back steps and on the rock in his yard.

The owner testified that the victim had his permission to be in the shop at night only to sleep and not to operate the equipment. He testified that if he had been alerted that the victim was using the equipment, he would have stopped him and that if the victim refused to stop, he would have told him to leave. He testified that the defendant had his permission to be in the upstairs area, and that the upstairs apartment was accessible from both an outdoor stairway and a stairway from the shop. The defendant did not have a key to the shop and

-12-

would not have been able to exit through the inner stairway if the shop were locked. The owner was aware that the defendant might have been in the shop at night but saw no need for him "to come down there at night and bother the man that was down there."

He stated the victim would get drunk and have problems but could not recall if he had told the defendant that the police picked on the victim. The owner recalled having asked the victim to put insulation into the apartment and recalled that the defendant gave the victim money to delay the job and to do work for the owner instead that day. He acknowledged having told the defendant that he wished the defendant had not given the victim money. The owner testified he did not recall an incident a month after the altercation when the defendant called the police regarding the victim making noise in the shop. After the incident, he told the victim he should not have been running the equipment and directed him not to do it again. The owner testified that the defendant did not have the right to be in the shop. On redirect, the owner testified that he allowed the defendant to remain in the apartment rent-free for the following year out of both a desire to help him and out of fear that he might damage the property if evicted. On re-cross, he did not know if the cost of the improvements the defendant had made was valued at $3,500.

At the close of the State's proof, the defendant asked the trial court for time to meet with an attorney he had just contacted who might be able to represent him. The State argued that the defendant had waived his right to counsel repeatedly on the record. The defendant asserted, "I have not waived my rights. I have been invoking my rights continuously." The attorney the defendant had attempted to hire asked the court for a two-hour recess, as she was in general sessions court at the time. The State characterized the defendant's attempt to hire counsel as "just another attempt on behalf of the defendant to delay this proceeding." The trial court noted, "I'm really of the opinion that he has, in fact, waived his attorney because he knew that he had a right to have a court-appointed attorney. He didn't want an attorney and he made that perfectly clear that he was going to represent himself. There are other things in the record that the Court will not go into." The trial court denied the recess, but allowed fifteen minutes for the attorney to form a contract with the defendant. At the end of that time, the attorney informed the court that she had a conflict of interest because she knew the victim but that she had advised the defendant not to testify prior to discovering her conflict. The court put the defendant under oath regarding his decision not to testify, and told the attorney, "If you had entered an appearance you would be asking the questions, and the Court accepted the entry of the appearance." The attorney asked for time to find someone to represent the defendant. The trial court did not allow additional time and conducted an inquiry under *Momon*. The defendant stated that he could not testify without counsel.

The defendant called the victim in order to introduce the dashboard camera recording in rebuttal. The victim testified he might have had one or two drinks and that he might have

told the police to give him a gun. The defendant introduced a transcript of the dashboard camera in which the victim asked the police, "Let me have your gun, I'll go take care of him." The victim told police he had had two drinks, to which the officer responded, "Don't lie to me[,] brother."

The defendant's closing statement contained the details of his version of the events. The defendant stated he had been asleep in bed when he was awoken by the "tumultuous" noise that the victim was making. He put on pants and a shirt and went downstairs, where he could smell the alcohol on the victim from fifteen feet away. The defendant stated he feared the victim because the victim had taken the $100 that the defendant gave him without performing any work in return and because the defendant as a result researched the victim's prior criminal history. The defendant stated he unplugged the machines and told the victim to leave. The victim went out into an anteroom but burst back in and tried to push past the defendant. The defendant restrained the victim who went limp and fell into the door. The defendant pulled the victim's arm "gingerly" back through the glass and saw no blood. The defendant walked the victim to the owner's home, knocking and shouting for the owner to come out. Receiving no response, he walked with the victim back into the yard, where they fell over the concrete table. The defendant, due to a physical condition, was unable to get up without letting go of the victim, so they remained there. When the moonlight broke through the trees, the defendant saw the victim was bleeding and went to his apartment to call the police. The defendant argued that he acted in self-defense and that the victim was invading the curtilage of his home.

The trial court instructed the jury that statements of counsel were not evidence and that the jury "shall not consider the request of James Richardson Reece . . . for the Court to appoint him an attorney or the Court's denial of that request or repeated requests for a court-appointed attorney or the Court's repeated denial." The defendant did not request an instruction on self-defense.

The jury convicted the defendant of aggravated assault, a Class C felony. At the sentencing hearing, the defendant again requested an attorney. The victim testified at the hearing, and the defendant during cross-examination highlighted the victim's prior poor dental condition and argued he was not responsible for the victim's loss of teeth. The trial court sentenced the defendant to six years' imprisonment. The defendant moved for a new trial and subsequently filed a "Motion to Strike Hearing Date of May 17, 2011" based on a potential need to amend his motion for a new trial. The defendant also filed a "Motion for Reduction of Sentence," challenging the application of certain enhancement factors.

During the May 17, 2011 hearing on the motion for a new trial, the defendant asserted

that he could not amend his motion for a new trial until the trial court had "unsealed"[8] the audio recordings of the jury trial. He also demanded an attorney. The trial court found that the recordings were not sealed and offered the defendant a copy of the transcript of the trial. The trial court interpreted the defendant's motion as one to strike his motion for a new trial. However, the trial court corrected its misapprehension in its written order, finding that the motion for a new trial had not been stricken but was still before the court. The trial court subsequently ruled on the motion, denying it. The defendant filed an objection, which the trial court also denied.

The defendant filed a notice of appeal on January 7, 2011 and amended it on February 14, 2011.[9] On appeal, the defendant was appointed counsel, was denied a request for new counsel, and was appointed new appellate counsel due to a change in former appellate counsel's employment. The defendant's two motions to replace his second appellate attorney were denied. The defendant's second attorney filed a brief raising two issues[10]: (1) the defendant challenged the sufficiency of the evidence, particularly as it supported the element of serious bodily injury; and (2) the defendant challenged the trial court's denial of counsel during the trial, the sentencing hearing, and the motion for a new trial.[11]

## II. Analysis

### A. Serious Bodily Injury

A conviction must be overturned where the evidence is insufficient to support the finding that the defendant was guilty beyond a reasonable doubt. Tenn. R. App. P. 13(e). In evaluating the sufficiency of the evidence, the appellate court must determine "whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v.*

[8]The defendant also filed an Application for Declaratory Relief and Direct Appeal of Trial Court Order Sealing Records in this Court on May 9, 2011, and the pleading was dismissed on June 10, 2011.

[9]It appears that this notice of appeal was forwarded by the clerk of the Criminal Court of Sumner County to this Court after the motion for a new trial was denied. The notice of appeal was not, as the defendant asserts in certain pro se filings with this Court, filed by some unknown person.

[10]The defendant's appellate counsel apparently incorrectly believed that the trial court had stricken the motion for a new trial and that the defendant could not appeal any of the issues raised therein.

[11]The defendant at various points has raised as an issue his claim that he was also denied his right to counsel at the preliminary hearing. Neither the preliminary hearing nor any other proceeding in general sessions court is a part of the record before us, and the defendant's appellate attorney makes no reference to the right to counsel at the preliminary hearing. Accordingly, we do not address this issue.

*Reid*, 91 S.W.3d 247, 276 (Tenn. 2002). The State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn from the evidence presented. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). This Court may not reweigh or reevaluate the evidence, and it may not substitute its inferences for those drawn by the trier of fact. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). All questions concerning the credibility of witnesses, the weight and value of the evidence, and factual issues raised by the evidence have been resolved by the trier of fact. *Id.*

A person commits an assault if he or she intentionally, knowingly, or recklessly causes bodily injury to another. T.C.A. § 39-13-101(a)(1) (2006 & Supp. 2009). An assault becomes aggravated, as pertinent here, if the defendant causes "serious bodily injury" to the victim and acts intentionally, knowingly, or – if the assault is based on bodily injury under Tennessee Code Annotated section 39-13-101(a)(1) – recklessly. T.C.A. § 39-13-102(a)(2)(A) (2006 & Supp. 2009). "Serious bodily injury" is defined as bodily injury that involves:

> (A) A substantial risk of death;
>
> (B) Protracted unconsciousness;
>
> (C) Extreme physical pain;
>
> (D) Protracted or obvious disfigurement;
>
> (E) Protracted loss or substantial impairment of a function of a
> bodily member, organ or mental faculty; or
>
> (F) A broken bone of a child who is eight (8) years of age or
> younger.

T.C.A. § 39-11-106(a)(34). The defendant contends that the State failed to show that the victim sustained a serious bodily injury as defined by statute. The defendant challenges the evidence linking the victim's loss of teeth to the assault and denies that his other injuries satisfy the statutory definition.

At trial, the State presented evidence tending to show that the victim suffered from extreme physical pain and protracted or obvious disfigurement. In *State v. Sims*, this Court

held that "loss of the victim's teeth could constitute protracted disfigurement," but found that causation was not supported by the proof, which consisted of the victim's testimony that her teeth began to hurt four or five days after the incident and a doctor's testimony that the victim had no loose teeth or bleeding in her mouth immediately after the incident and that he would be surprised if the assault was the cause of the loss of her teeth. *State v. Sims*, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995) *abrogated on other grounds as recognized by State v. Osborne*, No. 01C01-9806-CC-00246, 1999 WL 298220, at *3 (Tenn. Crim. App. May 12, 1999). In *State v. Sisk*, the victim acknowledged that she had dental problems and her teeth were deteriorating but testified that her pre-existing dental issues did not cause the loss of her teeth. *State v. Sisk*, No. 03C01-9410-CR-00367, 1997 WL 20129, at *4 (Tenn. Crim. App. Jan. 17, 1997). The Court in *Sisk* concluded that the evidence was sufficient to sustain a conviction for aggravated assault. *Id.*

The victim in the case sub judice suffered the loss of all his teeth and testified that although his teeth were not in the best shape, it was the defendant's assault that caused their extraction. The medical records reflect that he had multiple carious teeth. The records also show that, "due to the patient's devastated carious dentition," his teeth were extracted. The victim's records show he had previous missing, loose, and chipped teeth and periodontitits. The medical assessment states, "This patient has … several displaced mandibular fractures with poor dentition. We recommend a full mouth extraction . . . ." No medical personnel testified regarding the causal connection between the victim's extracted teeth and the assault. Although the victim, like the victim in *Sisk*, testified that his dental issues were not the cause of the extraction of his teeth, the medical evidence, like the medical evidence in *Sims*, explicitly attributed the loss of teeth to another cause. Whether or not the causal connection was established beyond a reasonable doubt under these circumstances is a close question which we need not answer, as the record provides alternative bases for finding that the victim suffered serious bodily injury.

Serious bodily injury may also be premised on extreme physical pain. This Court, while acknowledging the difficulty of quantifying pain, has previously held that extreme physical pain under the statute should belong to the same class of injury as the other injuries enumerated. *Sims*, 909 S.W.2d at 49. The *Sims* court held that a broken nose was not extreme enough to be in the same class with other enumerated injuries. *Id.*

Nevertheless, "the subjective nature of pain is a question of fact to be determined by the trier of fact." *State v. Love*, No. E2011-00518-CCA-R3-CD, 2011 WL 6916457, at *4 (Tenn. Crim. App. 2011) (concluding that cuts, bruises, an eye swollen shut, a "very, very, very high" level of pain, and protracted numbness in the lips constituted serious bodily injury); *State v. Dedmon*, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006). In *State v. Gibson*, this Court upheld the finding of serious

bodily injury where the victim had suffered multiple facial fractures from repeated blows, as well as some loss of consciousness, two black eyes, a large bruise to her right temple, an extremely bruised and protruding lip, a swollen and bloodied nose. *State v. Gibson*, No. M2005-01422-CCA-R3-CD, 2006 WL 770460, at *12 (Tenn. Crim. App. Mar. 24, 2006). Likewise, the defendant's conviction in *State v. Lee* was upheld where the victim suffered two black eyes, severe facial swelling, a torn lip, and severe headaches lasting three to four weeks, and he testified to having extreme pain, apparently more severe than a normal person with the injuries would have experienced. *State v. Lee*, No. M1999-01625-CCA-R3-CD, 2000 WL 804674, at *4 (Tenn. Crim. App. June 23, 2000).

The victim here testified that the defendant grabbed him, caused his arm to go through a glass pane, and pounded his head against a concrete cylinder for approximately thirty minutes. The victim ranked his pain as ten out of ten on at least two separate occasions at two separate hospitals, and his medical records document that he was grimacing, wincing, and moaning. His Sumner County Medical records indicate the presence of fractures other than that for which he had surgery. The victim had a steel plate inserted into his jaw, and the victim's jaw was wired shut. He was given morphine and percocet at the Sumner County hospital where he was treated, and he was given morphine, oxycodone, acetaminophen, percocet for pain and discharged with a prescription Lortab and ibuprofen at Vanderbilt. The gaping wound on his arm required twenty stitches. We conclude that the evidence was sufficient to establish that victim experienced extreme physical pain.

The element of serious bodily injury may also be proven by showing that the victim suffered "protracted or obvious disfigurement." This Court has previously held that a scar satisfies the requirement for "protracted or obvious disfigurement." *State v. Matthews*, No. M2010-00647-CCA-R3-CD, 2012 WL 5378046, at *4 (Tenn. Crim. App. Oct. 31, 2012) (citing cases in which a scar was held to be a sufficient basis for finding serious bodily injury); *State v. Capps*, No. M2010-02143-CCA-R3-CD, 2012 WL 3800848, at *7 (Tenn. Crim. App. Sept. 4, 2012) (same). The victim's testimony included a statement that there was still a scar present on his arm at the time of trial as a result of the large laceration requiring twenty stitches.

Based on the victim's extreme physical pain and protracted and obvious disfigurement, the evidence is sufficient to support the finding that the victim suffered serious bodily injury.

### B. Right to Counsel

The Sixth Amendment to the United States Constitution and article I, section 9 of the Constitution of Tennessee guarantee the accused a right to the assistance of counsel. *Lovin*

*v. State*, 286 S.W.3d 275, 284 (Tenn. 2009). Likewise, the accused has a right to self-representation. *State v. Northington*, 667 S.W.2d 57, 60 (Tenn. 1984). The right to self-representation and right to counsel are rights in the alternative, and the defendant cannot, for obvious reasons, assert both at the same time. *Lovin*, 286 S.W.3d at 284. Because the right to counsel affects the defendant's ability to assert his other rights, "the wrongful deprivation of a criminal defendant's right to counsel is a structural error which so contaminates the proceeding that reversal is mandated." *State v. Holmes*, 302 S.W.3d 831, 838 (Tenn. 2010). Whether the accused has waived the right to counsel or asserted the right to self-representation is a mixed question of law and fact reviewed de novo with a presumption of correctness of the trial court's factual findings. *State v. Hester*, 324 S.W.3d 1, 29-30 (Tenn. 2010).

### 1. Waiver

The right to self-representation may be asserted only after the defendant "knowingly and intelligently waives the valuable right to assistance of counsel." *Northington*, 667 S.W.2d at 60. In order for a defendant to exercise the right to self-representation, (1) the defendant's request to proceed pro se must be timely; (2) the assertion of the right of self-representation must be clear and unequivocal; and (3) the assertion of the right of self-representation must reflect a knowing and intelligent waiver of the right to counsel. *Hester*, 324 S.W.3d at 30-31. When a defendant has waived the right to counsel, he may not later assert that he was deprived of the assistance of counsel in error. *State v. Small*, 988 S.W.2d 671, 673 (Tenn. 1999).

Initially, we observe that Tennessee Rule of Criminal Procedure 44 requires that the waiver of the right to counsel be in writing. Tenn. R. Crim. P. 44(b)(2). In *State v. Goodwin*, the defendant had filed three signed motions in which he asserted the right to self-representation. *State v. Goodwin*, 909 S.W.2d 35, 39 (Tenn. Crim. App. 1995). The Court concluded that this satisfied the requirement of Rule 44 that the waiver be in writing. *Id.* Here, the defendant's "Compulsory Response" to Ms. Frost's motion to withdraw contained a prayer "in the alternative" for "no further appointment of counsel *at this time*" and referred to the defendant proceeding "reluctantly pro se." (Emphasis added.) Because the assertion of the right to self-representation must be "clear and unequivocal," we conclude that this does not satisfy the requirement that the waiver of the defendant's right to counsel at trial be in writing. *Hester*, 324 S.W.3d at 30.

Mr. McKinney attached a letter from the defendant to his motion to withdraw, in which the defendant asserts, "This letter will serve as Notice: I did not ask for assistance of counsel in my case before this court." This appears to be an (incorrect) statement of the defendant's past actions rather than an assertion of the right to self-representation. The

defendant's letter, citing *Faretta*, also states, "You are not now, nor can you be my attorney unless I request it or am otherwise determined incompetent." The defendant's right to self-representation is also referenced in his filings with this Court. Although the defendant asserts that he was deprived of the right to proceed pro se, the same filings assert that he "went unwillingly without attorney" and refer to his "compelled self-defense." We conclude that these writings also do not satisfy *Hester*'s requirement that the waiver be clear and unequivocal.

Furthermore, even if we were to find that the writing requirement was met, the record shows that the waiver was not valid because defendant was not properly warned regarding the dangers of proceeding pro se. Tennessee Rule of Criminal Procedure 44(b)(1) requires the trial court to both advise the defendant of his right to representation and "determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience, and conduct of the accused, and other appropriate matters." Tenn. R. Crim. P. 44(b)(1)(A)-(B). The Tennessee Supreme Court has described this as "an intensive hearing on the record to advise the prisoner of the consequences of self-representation and to determine that the prisoner knows and understands the consequences of his or her decision." *Lovin*, 286 S.W.3d at 288.

While the defendant need not have legal training in order to exercise the right to self-representation, he must have "made his decision knowing the disadvantages and the dangers of representing himself." *Goodwin*, 909 S.W.2d at 40. The United States Supreme Court has described the inquiry the trial court must undertake before accepting the defendant's waiver of the right to counsel:

> To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under

-20-

which such a plea is tendered.

*Von Moltke v. Gillies*, 332 U.S. 708, 723-24(1948).

In *Smith v. State*, the Tennessee Supreme Court recommended that a trial court ask the questions in the appendix of that opinion, drawn from 1 Bench Book for United States District Judges 1.02-2 to -5 (3d ed.1986). *Smith v. State*, 987 S.W.2d 871, 875 (Tenn. Crim. App. 1998). These questions inform the defendant of the nature of the charges and range of punishment he or she faces, as well as the fact that the defendant will be expected to conform to the Rules of Evidence and Criminal Procedure in trying the case. The questions also inform the defendant that he or she will not be able to present testimony as a narrative but must ask questions of him or herself. *Smith v. State*, 987 S.W.2d at 877-78 (appendix). The trial court is advised to warn the defendant that self-representation is unwise. *Id.*

In *Goodwin*, the trial court warned the defendant that he would not have access to a law library, that advisory counsel would provide minimal help, that the trial would not be held up to allow him to ask questions, and that the court would not inform him of the rules of evidence or local rules. *Goodwin*, 909 S.W.2d at 40 -42. This, combined with the court's strong cautions against proceeding pro se, was held to be adequate. *Id.* at 41-42.

In *Smith*, however, the trial court gave "no warnings of the pitfalls of self-representation" and did not ask about the defendant's background, education, or experience with the court system. The waiver was not valid because the trial court did not ascertain the defendant's understanding of the offenses charged, lesser included offenses, or punishments, and failed to warn the defendant against self-representation or inform the defendant that he would be held to the same standards as an attorney. *Smith v. State*, 987 S.W.2d 871, 876 (Tenn. Crim. App. 1998).

Likewise, in *Northington*, the waiver was found not to be valid because "[t]he trial court failed to diligently examine the defendant's background and experience, failed to notify defendant as to the possible extent of any penitentiary sentence, and failed to elaborate fully to defendant why he thought it 'unwise' to waive counsel." *Northington*, 667 S.W.2d at 61; *see also State v. Coleman*, 519 S.W.2d 581, 584 (Tenn. 1975) (concluding that defendant had not waived the right to counsel because "the record does not reflect the trial judge made the requisite inquiry and investigation to determine whether the respondent intelligently, understandingly and willingly waived the benefit of counsel" and there was no written waiver).

Here, although the trial court inquired into the defendant's desire to proceed pro se at the hearing on Mr. McKinney's motion to withdraw, the court did not make the inquiry

outlined in the appendix of *Smith*. At the hearing, the defendant gave no sworn testimony, and the trial court did not ask about the defendant's background or education, although the record shows that the defendant has a ninth-grade education and is extremely articulate and intelligent. The trial court did not explain the charges or potential punishments. At the July 2, 2010 hearing, the trial court had repeatedly referred to the appointment of elbow counsel for the defendant, but the trial court never explained to the defendant what this meant and never referenced the possibility again. Most importantly, the trial court did not warn the defendant about the risks of proceeding pro se. Although the defendant's counsel stated that the defendant understood the risks, there is no record of the warnings he was given. The record shows that the defendant, prior to meeting during trial with the attorney who advised him not to testify, planned to introduce his own testimony to show that the assault was committed in self-defense. The trial court never informed the defendant he would not be able to present his testimony as a narrative and in fact gave no warnings regarding the pitfalls of self-representation. Because the defendant was not warned regarding the risks of proceeding pro se, we conclude that the waiver was not valid.

## 2. Implicit Waiver

A defendant who has not waived the right to counsel under the criteria outlined above may nevertheless lose the right to an attorney through implicit waiver or forfeiture. "[T]he right to counsel is not a license to abuse the dignity of the court or to frustrate orderly proceedings" and can be implicitly waived "if a defendant manipulates, abuses, or utilizes the right to delay or disrupt a trial." *State v. Carruthers*, 35 S.W.3d 516, 546-47 (Tenn. 2000). The distinction between forfeiture and implicit waiver is that an implicit waiver is made when the defendant's misconduct continues after a warning from the court that such misconduct will result in the loss of the right to counsel, whereas "forfeiture results regardless of the defendant's intent to relinquish the right and irrespective of the defendant's knowledge of the right." *Id.* at 548.

Essential to implicit waiver, then, is a warning of the impending consequences and an opportunity for the defendant to avoid the extreme sanction of the loss of the right to counsel. "[A]n implicit waiver is presumed from the defendant's conduct after he has been made aware that his continued misbehavior will result in the dangers and disadvantages of proceeding pro se." *Holmes*, 302 S.W.3d at 840. The warnings need not be "extensive and detailed" and a general explanation of the risks of self-representation is sufficient. *Carruthers*, 35 S.W.3d at 549.

In *Holmes*, although the defendant assaulted his counsel, the Court concluded that he had not implicitly waived his right to counsel because "trial court never warned him about his conduct or the consequences of failing to conform his conduct to acceptable norms."

*Holmes*, 302 S.W.3d at 841. Here, the trial court believed that there had been a valid waiver of the defendant's right to counsel, and consequently, it did not warn the defendant that a continued failure to cooperate with counsel or continued vacillation regarding proceeding pro se would result in an implicit waiver of his right to the assistance of an attorney. The record does not show that the defendant was aware that a continuation of his disruptive behavior would result in the trial court denying him the assistance of an attorney during his trial. The trial court furthermore did not give even the general explanation of the risks of proceeding pro se required by *Carruthers*. *See Carruthers*, 35 S.W.3d at 549. The defendant was not warned about the consequences of continuing his behavior, and we accordingly conclude that he did not implicitly waive his right to counsel.

### 3. Forfeiture

A defendant who engages in "extremely serious misconduct" may forfeit the right to counsel even without a warning regarding the potential for implicit waiver or an explanation of the pitfalls of self-representation. *Carruthers*, 35 S.W.3d at 548. Utilizing the right to counsel to manipulate, delay, or disrupt trial may result in forfeiture. *Id.* at 549. Factors which the trial court must consider to determine whether forfeiture has occurred include: "(1) whether the defendant has had more than one appointed counsel; (2) the stage of the proceedings, with forfeiture 'rarely ... applied to deny a defendant representation during trial'; (3) violence or threats of violence against appointed counsel; and (4) measures short of forfeiture have been or will be unavailing." *Holmes*, 302 S.W.3d at 839 (quoting *Commonwealth v. Means*, 907 N.E.2d 646, 659-61 (2009)). Forfeiture is an extreme sanction, and "only the most egregious misbehavior will support a forfeiture of [the right to counsel] without warning and an opportunity to conform [the defendant's] conduct to an appropriate standard." *Holmes*, 302 S.W.3d at 846.

In *State v. Parsons*, this Court concluded that the defendant had not executed a valid waiver but had nevertheless forfeited the right to counsel because the record demonstrated "that the Defendant's pretrial conduct was egregiously manipulative and that he deliberately engaged in this conduct with the aim of delaying, disrupting, and/or preventing the orderly administration of justice." *State v. Parsons*, No. W2010-02073-CCA-R3-CD, 2011 WL 6310456, at *13 (Tenn. Crim. App. Sept. 7, 2011). Like the defendant in the case at bar, the defendant in *Parsons* had more than one trial attorney, was uncooperative with the attorneys appointed by the trial court, vacillated between asserting his right to self-representation and his right to counsel, and filed suit against persons associated with the trial court in federal court as well as filing numerous appeals in state court. *Id.* at 21-23. The defendant in *Parsons* also sought several continuances, made unfounded accusations of personal and professional misconduct against his lawyers, sued his lawyer in federal court in order to manufacture a conflict of interest, filed complaints against both his lawyers with the Board

of Professional Responsibility, filed a complaint with the police department accusing his attorney of assault, threatened his attorney with a civil suit, and intentionally manipulated court-ordered evaluations to determine his competence.

The trial court in *Parsons* found that the defendant's conduct was calculated "to manipulate continuances," "to be manipulative of the judicial process," and "to postpone his trial," and that it was "egregiously manipulative and abusive of the judicial process."[12] *Id.* at *21 n.15. This Court concluded that he had forfeited his right to an attorney because his "course of conduct was an egregious manipulation of the judicial system, and of the constitutional rights afforded to criminal defendants, in order to delay, disrupt, and prevent the orderly administration of justice." *Id.* at 23.

A trial court may generally only find the defendant has forfeited the right to counsel after holding an evidentiary hearing during which the defendant is permitted to testify. *Holmes*, 302 S.W.3d at 838-39. In a footnote, the *Holmes* court explains that this rule does not apply when the conduct which serves as the basis for forfeiture takes place in open court. *Id.* at 839 n.6. The burden of proving that the defendant's actions justify forfeiture is on the State. *Id.* at 839. Here, the trial court held no evidentiary hearing. Even more significantly, the trial court did not make the crucial finding that the defendant was intentionally manipulating the judicial system and had forfeited the right to counsel due to his efforts to delay or disrupt the proceedings. Because there was no hearing and no factual findings were made, the trial court did not consider the factors enumerated in *Holmes*. *See Holmes*, 302 S.W.3d at 839.

Although the defendant's conduct here was in many ways similar to the conduct of the defendant in *Parsons*, the trial court in the case at bar did not find that the defendant was intentionally manipulating or attempting to disrupt his trial. While the defendant's behavior is, as the State argued during trial and on appeal, consistent with an attempt simply to delay justice, it is equally consistent with the defendant holding an honest, although misguided and incorrect, conviction that the court system of Sumner County was maliciously intent upon depriving him of a fair trial. Because the trial court believed it had obtained a valid waiver of the defendant's right to counsel, it did not make any finding that the defendant was intentionally delaying or disrupting the proceedings. We also note that the trial court

---

[12]The trial court made these findings, along with the ruling that the defendant had forfeited the right to counsel, in an order denying the defendant's motion for a new trial. In affirming, this Court held that the trial court had previously made an "implied finding" that the defendant had forfeited his right to counsel. *Parsons*, 2011 WL 6310456, at *21 & n.15. Because the case at bar presents us with a situation in which the trial court made no determination whatsoever that the defendant was manipulating the administration of justice, we do not examine the timing of the factual findings in *Parsons*.

-24-

apparently did not think the defendant had forfeited or implicitly waived the right to counsel, as the trial court permitted him to attempt to hire an attorney to assist him in presenting his defense and the trial court informed the jury that he had chosen to proceed pro se. The defendant's inability to cooperate with his attorneys might have been the result of an "intentional pattern of obstinate, dilatory, bullying behavior [and] an effort to threaten, coerce, and egregiously manipulate the entire judicial system," *Parsons*, 2011 WL 6310456, at *17, but the trial court did not make a factual determination that this was the case. Because the trial court did not make any findings that the defendant's behavior was an egregious manipulation of the judicial process aimed at disrupting or delaying trial, we hold that the defendant did not forfeit his right to counsel.

While the trial court properly attempted to prevent the defendant's vacillation regarding his right to counsel from delaying the proceedings unnecessarily, the trial court did not properly warn the defendant regarding the pitfalls of waiving his right to counsel and proceeding pro se and did not obtain a written waiver. The trial court also did not give the general warnings which would serve to support the finding that the defendant, by refusing to cooperate with his attorneys, had implicitly waived his right to counsel. Because the trial court did not make any findings that the defendant's behavior was calculated to manipulate, disrupt, or delay trial or obstruct justice, we cannot conclude that the defendant's conduct was so egregious that he forfeited the right to representation. Accordingly, we conclude that the defendant was entitled to representation at trial. The deprivation of the right to counsel is per se reversible error. *Holmes*, 302 S.W.3d at 848. The defendant's conviction is reversed and the case is remanded for a new trial.

## CONCLUSION

Although the evidence is sufficient to support the finding of guilt beyond a reasonable doubt, we conclude that the defendant was denied his right to counsel and we reverse and remand for a new trial.

_____
JOHN EVERETT WILLIAMS, JUDGE